# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### IN ADMIRALTY

CASE NO. 18-CV-1400-CMA

OPENWATER SAFETY IV, LLC,
Plaintiff/Counter-Defendant,

v.

GREAT LAKES INSURANCE SE,
Defendant/Counter-Plaintiff.
_____/

## GREAT LAKES INSURANCE SE'S MEMORANDUM OF LAW IN OPPOSITION TO OPENWATER SAFETY IV, LLC'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, GREAT LAKES REINSURANCE SE, by and through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 56.1(a) of the Local Rules of the United States District Court for the District of Colorado, and for its memorandum of law in opposition to Plaintiff OPENWATER SAFETY IV, LLC's pending motion for summary judgment, respectfully states as follows:

### Statement of Material Facts Not in Dispute

The present dispute arises out of the issuance of a policy of marine insurance by the Defendant, GREAT LAKES INSURANCE SE (hereinafter "GLI") to the Plaintiff, OPENWATER SAFETY IV, LLC (hereinafter "OPENWATER").   Docket Entry #9.   On April 2, 2018, OPENWATER submitted to GLI an application for a policy of marine insurance.[1]   The application

---

[1] The application, along with the email and supporting materials, is attached hereto as Exhibit 1. Exhibit 1 includes the email from MARATIME PROGRAM GROUP to Concept requesting that coverage be bound, as well as the attachments to that email; the Letter of Survey Recommendation Compliance, the Paid Crew Supplementary Sheet, the executed application, and the "Findings and Recommendations" section of the Report of Survey produced by Jonathan Sands (the entire report was too large to attach as one file, but can be provided to the Court upon request).

was submitted to GLI's underwriting and claims handling agent, Concept Special Risks, Ltd. (hereinafter, "Concept").  The application disclosed that OPENWATER was seeking $780,000 in first-party property damage coverage for a 2013 Lagoon 52' sailing vessel named "Heavan" (hereinafter "the vessel").  Ex 1, p. 5 (UF000023).  The application and the Paid Crew Supplementary Sheet disclosed that OPENWATER intended to employ two crew aboard the vessel, a captain and a mate.  Ex 1, p. 4-6 (UF000022-24).  The application required that, "<u>ALL OPERATORS MUST BE DETAILED</u>[.]"  Ex 1, p. 7 (UF000025) [emphasis in original].  The application disclosed only two operators, Evan-Pierre Bernard Genaud and Manuel Giovanni Cardenas Martinez.  Ex 1, p. 7 (UF000025).  The application stated, "**WARNING: THIS IS A NAMED OPERATOR ONLY POLICY**".  Ex 1, p. 7 (UF000025) [emphasis in original].

The application was submitted to Concept by OPENWATER's agent, MARITIME PROGRAM GROUP (hereinafter "MPG").  Ex 1, p. 1 (UF000019), Affidavit of Beric Anthony Usher attached hereto as Exhibit 2, ¶¶9-12, Concept Special Risks Limited – US Operating Instructions is attached hereto as Exhibit 3, p. 1.[2]   As part of the application, OPENWATER also submitted a Report of Survey produced by Jonathan Sands based on his examination of the vessel on March 15, 2018 (hereinafter "the Sands Report").  Ex 1, p. 11 (UF000029).[3]

In addition to submitting the application, OPENWATER also submitted to Concept a Letter of Compliance attesting to the completion of all but four of the recommendations in the Sands

---

[2] At the time that the Concept Special Risks Limited - US Operating Instructions was executed, MARITIME PROGRAM GROUP was known as "Maritime General Agency, Inc."  The documents attached as Exhibit 4 reflects that Maritime General Agency, Inc. changed its name to MARITIME PROGRAM GROUP in 2015.

[3] Ambiguous verbiage is interpreted against the drafter.  *M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127, 142 (C.A.2.2005), *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (C.A.10.1995), Bailey v. Lincoln General Ins. Co., 255 P.3d 1039, 1049 (Colo.2011), *Scalia v. Equitable Life Assur. Soc. of U.S.*, 263 A.D.2d 537; 693 N.Y.S.2d 218 (1999).  However, neither GLI nor Concept drafted the Sands Report.

Report. Ex 1, p. 3 (UF000021). The Letter of Compliance (hereinafter "LOC") stated, "I certify, as owner of the above vessel, that all recommendations pertaining to the above vessel contained within the detailed survey submitted herein, have been complied with, other than those listed below, along with the date of expected completion[.]" Ex 1, p. 3 (UF000021). The LOC then listed four "**AA**" deficiencies that had yet to be corrected; (1) "[t]hree current fire extinguishers, USCG sound producing device, current flare kit", (2) "[s]tern light cracked and inoperable", (3) "[b]ow lights (navigation lighs) are intermittent", and (4) "a trash disposal placard, an oil disposal placard, the HIN number is not engraved on the hull". Ex 1, p. 3 (UF000021) and Ex 1, p. 37 (UF000055). No other deficiencies, either "**AA**", "**B**", or "**C**", were identified in the LOC. Ex 1, p. 3 (UF000021) and Ex 1, p. 37 (UF000055). However, as detailed below, numerous "**AA**", "**B**", and "**C**" deficiencies had not been addressed at the time the LOC was executed. This was both a misrepresentation of material facts and a breach of the survey compliance warranty.

Upon receipt, the underwriter at Concept reviewed the material facts disclosed by OPENWATER in the application, the Sands Report, and the LOC. Ex 2, ¶¶14-16. Based on the material facts disclosed in the application, the Sands Report, and the LOC, the underwriter at Concept made the decision whether to offer a policy of marine insurance, what terms to require, and what premium to charge. Ex 2, ¶24. Aware that the Sands Report stated that certain recommendations could be complied with in the future, Concept relied upon OPENWATER's representation that all the recommendations in the Sands Report "have been complied with." Ex 2, ¶24. This representation, that the recommendations in the Sands Report had already been complied with, was material to the underwriter's judgment because the performance of this work related to the insured's care for the vessel and the value of the risk insured. Ex 2, ¶¶17-23. However, as detailed above, numerous recommendations in the Sands Report had not been

complied with at the time that OPENWATER applied for coverage.  Ex 2, ¶31.  Had OPENWATER disclosed the truth, that not all the recommendations in the Sands Report had been complied with, Concept's underwriter, like any intelligent and prudent underwriter, would have refused to issue any policy of marine insurance whatsoever.  Ex 2, ¶¶33-37.

In reliance on the truth of the material facts disclosed by OPENWATER in the application and the LOC, Concept, acting as underwriting and claims handling agent for GLI, issued to OPENWATER marine insurance policy no. CSRYP/167347.  Ex 2, ¶24 and ¶32.  The basic facts pertaining to the coverage afforded under CSRYP/167347 were outlined in the two-page Temporary Binder.  The two-page Temporary Binder is attached hereto as Exhibit 5.  Temporary Binder stated its short period of interim coverage, "Valid to May 10, 2018".  Ex 5, p. 1 (UF000133).  The Temporary Binder identified the policy number, "CSRYP/167347".  Ex 5.  The Temporary Binder identified the insured, "Openwater Safety IV, LLC".  Ex 5.  The Temporary Binder identified the insured's agent, "Maritime Program Group, Inc."  Ex 5.  The Temporary Binder identified the vessel, "Heavan, 2013 52 Lagoon with Yanmar twin 74hp diesel engine, FR-CNB52017B313".  Ex 5.  The Temporary Binder identified the Period of Cover, "from April 7, 2018 00.01 LST to April 7, 2019 00.01 LST".  Ex 5.  The Temporary Binder identified the Hull coverage limit, "US $780,000".  Ex 5.  The Temporary Binder identified the Named Operators, "Evan-Pierre Bernard Genaud; Manuel Giovanni Cardenas Martinez".  Ex 5.  The Temporary Binder identified the **Insuring Agreement Wording**, "As per PYP/5/COM".  Ex 5, p. 2.  The Temporary Binder identified the Insurance Provider, "Great Lakes Insurance SE".  Ex 5.  Finally, the Temporary Binder stated, "For more information regarding Concept Special Risks Ltd, policy wordings, endorsement wordings, standard forms and frequently asked questions, please see our

website www.special-risks.com.   Ex 5.   PYP/5/COM is available for download directly from

Concept's website.  Exhibit 6, p. 2.

However, totally absent from the two-page document titled "Temporary Binder" is any

statement of what risks are insured against.  Ex 5.  The two-page Temporary Binder does not state

the definitions of any words.  Ex 5.  The two-page Temporary Binder does not state the terms and

conditions that apply to coverage.  Ex 5.  The two-page Temporary Binder does not state the

insured's post-loss rights and duties.  Ex 5.  Most importantly, there is nothing in the two-page

Temporary Binder which says that any particular loss is or is not covered.  Ex 5.

All of that necessary information, indispensable for coverage, is stated in the document

labelled PYP/5/COM, specifically referenced in the two-page Temporary Binder and publicly

available from Concept's website.  PYP/5/COM is attached hereto as Exhibit 7.  Just to be clear,

"the policy" comprises the two-page Temporary Binder and PYP/5/COM.  PYP/5/COM states in

relevant part:

- 'Covered person' means you, any/or any person detailed on your application form which has
  been submitted by you and approved by us, provided that person has been declared to us in
  writing as an operator of the Scheduled Vessel.  Ex 7, p. 1.

- 'Operate, operation, operating' means to navigate or be in physical control of or at the helm of
  the Scheduled Vessel.  Ex 7, p. 2.

- [W]e provide coverage for accidental physical loss of or physical damage to the Scheduled
  vessel… subject to the insuring agreement provisions, conditions, warranties, deductibles and
  exclusions.  Ex 7, p. 2.

- a) It is warranted that the Scheduled Vessel is seaworthy at all times during the duration of this
  insuring agreement.  Breach of this warranty will void this insuring agreement from its
  inception.  Ex 7, p. 10.

- g) If you have used a broker to effect coverage, it is hereby agreed that your brokers or any
  substituted brokers (whether surplus line approved or otherwise), shall be deemed to be
  exclusively the agents of you and not of us in any and all matters relating to, connected with
  or affecting this insurance.  Any notice given or mailed on behalf of us to the said brokers in

connection with or affecting this insurance, or its cancellation, shall be deemed to have been delivered to you.  Ex 7, p. 11.

- q) Unless we agree in writing to the contrary, if we request a survey of the Scheduled Vessel then it is warranted that such survey is in existence prior to the effective date of this insurance and a copy of the same must be received by us within 30 days of the effective date of this agreement. If the survey makes any recommendations with respect to the Scheduled Vessel, then it is warranted that all such recommendations are completed prior to any loss giving rise to any claim hereunder, by skilled workmen using fit and proper materials and that either.

1) The surveyor who carried out the survey certifies in writing that all recommendations have been completed to his (the surveyors) satisfaction prior to any loss and/or claim

   Or,

2) The workmen/repair yard that carried out the said work and/or recommendations certifies in writing that all recommendations have been completed prior to any loss and/or claim. Failure to comply with this warranty will void this agreement from inception.  Ex 7, p. 12.

- s) Where any term herein is referred to a 'warranty' or where any reference is made herein to the word 'warranted', the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception.  Ex 7, p. 12.

- v) It is warranted that the Scheduled Vessel will be operated only by covered persons… Ex 7, p. 12.

- **It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York.** Ex 7, p. 14 [emphasis in original].[4]

---

[4] This exact choice of law clause has been found valid and enforceable by multiple federal appellate and district courts throughout the United States. *Great Lakes Reinsurance (UK) PLC v. Durham Auctions Inc.*, 585 F.3d 236; 2010 A.M.C. 185 (5th Cir.2009), *Great Lakes Reinsurance (UK) PLC v. Vasquez*, 341 Fed.Appx. 515 (11th Cir.2009), *Joseph v. Great Lakes Reinsurance (UK) PLC*, 2011 U.S.Dist LEXIS 35428 (N.D.Oh.2011), *Great Lakes Reinsurance (UK) v. Rosin*, 757 F.Supp.2d 1244, 1251, 2011 A.M.C. 223 (S.D.Fla.2010), *Great Lakes Reinsurance (UK), PLC v. Sea Cat I, LLC*, 653 F.Supp.2d 1193, 2010 A.M.C. 703 (W.D.Ok.2009), *Great Lakes Reinsurance (UK) PLC v. Dion*, 2010 A.M.C. 338 (S.D.Cal.2009), *Great Lakes Reinsurance (UK) PLC v. S. Marine Concepts, Inc.*, 2009 A.M.C. 1093 (S.D.Tex.2008).

Finally, the Concept Special Risks Limited – US Operating Instructions, executed by MPG, states as follows:

"1. You and any Insurance agent which you deal with are agents of the Assured, you have no authority to bind insures to any risk or make alterations to any document issued by our offices of any nature whatsoever without our written consent.  You have no authority to issue any document from your office that represents that you have such authority.  You warrant that you have the authority of your client, the assured and are authorized to negotiate and or accept any document upon their behalf including but not restricted to, any notice of cancellation."  Ex 3, p. 1.

The Concept Special Risks Limited – US Operating Instructions, executed by MPG, further states:

"5. Our standard insuring agreement wordings are incorporated into any insuring agreement that comes into existence as a result of binding a risk hereunder.  It is essential that you read these wordings carefully and convey their contents to the Assured or you agent.  Signing this document shall be deemed confirmation that you have read and understand these wordings."  Ex 3, p. 1.

The effect of this document, the Concept Special Risks Limited – US Operating Instructions (Ex 3), is that OPENWATER's agent, MPG, always had a copy of PYP/5/COM.  Even if no individual at Concept or MPG ever actually sent a copy of PYP/5/COM to OPENWATER, and even if the two-page Temporary Binder is the only document that OPENWATER ever actually received, MPG always had a copy of PYP/5/COM.  The documents discussed above establish that, with respect to policies of marine insurance issued by GLI, MPG never acted in any capacity except as the agent of the insured, OPENWATER.  It is an irreducible first principle of both New York law and Colorado law that the knowledge of an agent is imputed to the principal.  *See cases cited infra*.  Therefore, notwithstanding the constant protestations by opposing counsel that "no policy of insurance was ever issued," OPENWATER had possession of the entire policy of marine insurance; actual possession of the two-page Temporary Binder and constructive possession of PYP/5/COM.

As part of the application, OPENWATER submitted to Concept a copy of the Sands Report and a Letter of Compliance attesting to the completion of all but two of the recommendations in the Sands Report.  Ex 1, p. 3 (UF000021).  The Sands Report identified four types of deficiencies:

- "Deficiencies categorized as an "**A**" finding are **SAFETY RELATED**.  Safety related findings represent an endangerment to personnel and/or the vessels safe and proper operating condition and should be addressed before the vessel is next underway or left unattended at dock or mooring."  Ex 1, p. 37 (UF000055).

- "Deficiencies categorized as an "**AA**" finding are **RGULATORY RISK RELATED**.  Regulatory Risk Related findings are in violation of United States Coast Guard (USCG) regulations.  These findings may not necessarily need to be resolved prior to conducting a Sea Trial provided the owner and vessel operators are willing to assume the risk of being boarded and possible fined."  Ex 1, p. 37 (UF000055).

- "Deficiencies categorized as a "**B**" finding are **OTHER DEFICIENCIES** and should be addressed in the near future so as to maintain standards and help the vessel retain its value."  Ex 1, p. 37 (UF000055).

- "Deficiencies categorized as a "**C**" finding are **SURVEYORS NOTES AND OBSERVATIONS** and may be done in the future to help the vessel retain its value."  Ex 1, p. 37 (UF000055).

As discussed in more depth below in the legal analysis, there is one absolutely dispositive fact to note at this point: neither GLI nor Concept drafted the Sands Report.  Therefore, whatever OPENWATER may have thought was the permissible timeline for addressing the "**AA**", "**B**", and "**C**" recommendations, any alleged ambiguity in the Sands Report cannot be interpreted against GLI.  Since the Sands Report was actually drafted by a surveyor retained by OPENWATER, the rule of *contra proferentem* does not apply.  *See cases cited infra.*

The LOC stated, "I certify, as owner of the above vessel, that all recommendations pertaining to the above vessel contained within the detailed survey submitted herein, have been complied with, other than those listed below, along with the date of expected completion[.]"  Ex 1, p. 3 (UF000021).  The LOC then listed four "**AA**" deficiencies that had yet to be corrected; (1)

8

"three current fire extinguishers, USCG sound producing device, current flare kit", (2) "[s]tern light cracked and inoperable",  (3) "[b]ow lights (navigation lights) are intermittent", and (4) a trash disposal placard, an oil disposal placard, The HIN is not engraved on the hull".  Ex 1, p. 3 (UF000021) and Ex 1, p. 37 (UF000055).  No other uncompleted deficiencies, either "**AA**", "**B**", or "**C**", were identified in the LOC.  Ex 1, p. 3 (UF000021) and Ex 1, p. 37 (UF000055).  Right above the signature of Evan Genaud, the LOC concluded with this warning, "**Any misrepresentation in this letter of compliance may render insurance coverage null and void from inception.**"  Ex 1, p. 3 (UF000021).   Notwithstanding the clear requirements of the LOC, numerous "**AA**", "**B**", and "**C**" deficiencies had not been addressed at the time the LOC was executed.  *See facts discussed infra*.  This was both a misrepresentation of material facts and a breach of the policy's survey compliance warranty.

On April 28, 2018, while the vessel was travelling between the Dominican Republic and Columbia, the vessel's mast came down.  Report of John Gordon, p. 1, attached hereto as Exhibit 8.  Both witnesses to the event, the captain and the mate, have disappeared and are unavailable to be deposed and to give admissible evidence.  The only evidence as to the cause of the dismasting is the post-loss investigation undertaken by John Gordon.  John Gordon was assigned by GLI's agent, Concept, to investigate the cause of the loss and determine the extent of the damage.  Deposition of John Gordon, p. 17, attached hereto as Ex 9 (the entire deposition of John Gordon is too large to attach as one file, so only the title page, pages 17-29, pages 93-104, and the signature page are attached; a fully copy of his deposition can be provided to the Court upon request).  John Gordon (hereinafter "Gordon") examined the vessel on May 2 and May 3.  Ex 8, p. 2.  Gordon identified the cause of the dismasting as "head stay failure, while underway the headstay/forestay cable pulled out of the terminal at the top of the mast."  Ex 8, p. 2.  Although he testified that the

dismasting was accidental, meaning it was not intended by the insured, Gordon could identify no cause for the failure of the head stay.  Ex 9, p. 29.  He testified, "It looked like it simply pulled free from the swage fitting."  Ex 9, p. 29.  Neither in his deposition, nor in his earlier report, was Gordon ever able to identify any force or event which worked on the mast to cause it to fall.  As far as Gordon or anyone else could tell, the mast simply fell with no discernable cause.  Ex 9, p. 29.

In addition to investigating the cause of the dismasting, Gordon also noted that numerous "**AA**", "**B**", and "**C**" recommendations from the Sands Report had not been addressed prior to the loss.  Ex 8, pp. 2-3.  Gordon's report specifically stated:

<u>"**WERE ALL THE PRELOSS RECOMMENDATIONS COMPLIED WITH?**</u>
<u>        Yes          No     X          </u>
Ex 8, p. 2.

At his deposition, Gordon testified that all the following recommendations were not complied with:

- **AA1**: The vessel was not equipped with a USCG approved sound producing device, a current flare kit, a trash disposal placard, and an oil disposal placard.
- **AA3**: The stern light was still cracked.
- **B1**: The docklines were still in poor condition.
- **B3**: The washing machine was not replaced.
- **B4**: The main engine exhaust hoses were not replaced.
- **B6**: The canvas was not replaced.
- **B7**: The trampoline was not replaced.
- **B8**: The corrosion on the thru-hull and valve assembles was not removed.
- **B9**: The two batteries in the mechanical space had not been replaced.
- **B15**: The starting batteries were not replaced.
- **B18**: The anchor roll bar was not replaced.
- **B21**: The port aft cabin portlight hinges were not replaced.
- **B23**: The port saildrive high water alarm was not reconnected.
- **B24**: The exhaust connections were not repaired and replaced.
- **B26**: The autopilot joystick was not repaired.
- **C2**: The upside down VHF radio was not remounted.
- **C3**: The port aft inboard cleat was not repaired or replaced.
- **C4**: The starboard winch trim was not replaced.
- **C6**: The impact damage on the port side of the hull was not repaired.

- **C8**: The interior mirror edges were not repaired.
- **C9**: The port midship washroom rope lighting was not repaired.
- **C10**: The main salon port forward bilge was not repaired.
- **C11**: The Schieber display screen was not addressed.
- **C14**: The isolation mats were not replaced.
- **C15**: The gas lift shocks were not repaired or replaced.
- **C18**: The disarray of the forepeak crew quarters was not addressed.
- **C19**: The cockpit overhead storage safety lock was not repaired or replaced.
- **C21**: The anchor bridle was not repaired or replaced.
- **C22**: The hull striping was not repaired or replaced.
- **C25**: The cracked starboard after teak step was not repaired or replaced.
- **C26**: The port midship washroom deck insert was not addressed.
- **C27**: The refrigerator in the galley was not addressed.
- **C28**: The air conditioning compressor was not addressed.

Ex 9, pp. 93-104.

Notwithstanding the failure of OPENWATER to comply with these recommendations, OPENWATER certified in the LOC that all the recommendations in the Sands Report "have been complied with[.]"  Ex 1, p. 3 (UF000021).

## Choice of Law

Where there exists a rule of federal admiralty law, policies of marine insurance are governed by federal admiralty law.  *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310; 1955 A.M.C. 467 (1955).  This rule applies to all policies of marine insurance, on both commercial craft and private pleasure craft.  *Acadia Ins. Co. v. McNeil*, 116 F.3d 599, 602; 1997 A.M.C. 2409 (C.A.1.1997).  However, where there exists no established rule of federal admiralty law, state law will control.  *Wilburn Boat*, at 315.

The present policy of marine insurance contained a choice of law clause which stated, "It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York."  Ex 7.  Therefore, as

11

discussed in more depth below, for any issue not governed by an established rule of federal admiralty law, New York law will apply. *Id.*

<u>**Argument – OPENWATER's Knowledge of the Disputed Policy Provisions**</u>

Much of OPENWATER's summary judgment motion is spent asserting that there must be coverage for the dismasting because OPENWATER allegedly never received a copy of any document other than the two-page Temporary Binder. OPENWATER seems to think that, since it never received the document PYP/5/COM, and since the provisions relied upon by GLI are all contained in the document PYP/5/COM, those provisions cannot be enforced against OPENWATER. The insurmountable problem for OPENWATER is that, even if OPENWATER never received a copy of PYP/5/COM, OPENWATER's agent, MPG, most certainly did receive a copy of PYP/5/COM. Ex 3, p. 1. In fact, the instructions from Concept make clear that it was MPG's duty to be aware of the terms and conditions of PYP/5/COM and that it was MPG's duty to make the insured aware of this document. *Id.* Therefore, knowledge of that document is imputed to OPENWATER and the provisions of PYP/5/COM are enforceable against OPENWATER.

This exact issue arose in another recent case where another unhappy insured tried to avoid unfavorable policy language by claiming that he never got the relevant policy document. *Markel American Ins. Co. v. Bachmann*, 2011 A.M.C. 41 (W.D.Wis.2010), *Markel American Ins. Co. v. Bachmann*, 2010 WL 2262614 (W.D.Wis.2010). The *Bachmann* case began much like the present one, with a policy of marine insurance which contained a named operator endorsement. *Id.*[5] Just like the named operator warranty in the present case, the named operator endorsement in

---

[5] As this Court is aware, Defendant GLI has filed a motion seeking to amend its counterclaim to add a cause of action alleging breach of the policy's named operator warranty. DE#105.

*Bachmann* restricted operation to the only two operators disclosed on the application and named on the declarations page, the insured and his wife. *Id*. Later, the vessel was damaged while being operated by an individual other than the insured or his wife. *Id*. When Markel denied coverage, Bachmann attempted to defeat the denial by claiming that he never received the specific page of the policy which contained the named operator endorsement and, for purposes of summary judgment, Markel stipulated to this dubious claim. *Id*. Nonetheless, Markel presented undisputed evidence showing that the insured's agent had received a copy of the disputed endorsement. *Id*. Therefore, applying the universal rule that the knowledge of the agent is imputed to the principal, the federal court held that the breach of the named operator endorsement barred coverage for the loss. *Id*.

The exact same principle applies in the present case. MPG possessed a copy of PYP/5/COM and was aware of its contents. Ex 3. Under New York law and Colorado law, the knowledge of MPG is imputed to OPENWATER. *New York Marine & General Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122; 2002 A.M.C. 149 (C.A.2.2001) ("Under New York law, knowledge acquired by an agent acting within the scope of its agency is imputed to the principal, even if the information was never actually communicated."), *Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo.1994). MPG's knowledge of the definitions employed in PYP/5/COM is imputed to OPENWATER. *Id*. MPG's knowledge of the fortuity requirement contained in PYP/5/COM is imputed to OPENWATER. *Id*. MPG's knowledge of the agency relationships detailed in PYP/5/COM is imputed to OPENWATER. *Id*. MPG's knowledge of the named operator warranty in PYP/5/COM is imputed to OPENWATER. *Id*. MPG's knowledge of the choice of law clause in PYP/5/COM is imputed to OPENWATER. *Id*. MPG's knowledge of the survey compliance warranty in PYP/5/COM is imputed to OPENWATER. *Id*. Therefore, regardless of what

OPENWATER may or may not have actually received, OPENWATER must be held to have had constructive knowledge of PYP/5/COM. *Id.* Therefore, OPENWATER cannot avoid its non-compliance with the terms of the policy by claiming ignorance. *Id.*

### Argument – No Coverage by Estoppel

Even if it is true that OPENWATER never received any of the policy documents upon which GLI depends, and putting aside for the moment MPG's undisputed knowledge and possession of these documents, such alleged lack of receipt does not have the effect which OPENWATER claims. This is because the one document which OPENWATER concedes receiving, the two-page Temporary Binder, has absolutely no language saying what types of losses are covered and what types of losses are excluded. While the two-page Temporary Binder states many facts essential to coverage, it says absolutely nothing which might indicate that there is coverage for a falling mast. To find that language, one must look at PYP/5/COM, the document which contains the coverage for fortuities, the specific exclusions, the terms and conditions, the choice of law clause, and the survey compliance warranty. However, this is precisely the document which OPENWATER contends is ineffective. The insurmountable problem for OPENWATER is that coverage cannot be created by estoppel. *St. Paul Fire and Marine Ins. Co. v. Vest Transp. Co., Inc.*, 666 F.2d 932, 947-48 (C.A.5.1982) (applying federal admiralty law), *Commercial Union Ins. Co. v. Roxborough Village Joint Venture*, 944 F.Supp. 872, 837 (D.Colo.1996) (applying Colorado law), *Ward v. County of Allegany*, 34 A.D.3d 1288, 1290 (N.Y.S.2006) (applying New York law). Either PYP/5/COM is effective, in which case all its terms are effective, or PYP/5/COM is ineffective, in which case there cannot possibly be coverage for OPENWATER's loss. OPENWATER cannot claim coverage under a document which it simultaneously insists is a nullity.

As this Court rightly noted in its decision dismissing Concept, "Openwater cannot accept and interpret the documents that lie at the core of its claims in its favor and then repudiate them when inconvenient.  Therefore, this court finds that despite Plaintiff's insistence that Openwater received no insurance policy [#34-3 at ¶ 24], the Temporary Binder and the Insuring Agreement comprise the insurance policy central to its claims."  DE#45, p. 11.  This Court has already seen through the absurdity of the Plaintiff's argument and grasped the essential legal principal that coverage cannot be created by estoppel.  This rule applies under federal admiralty law, New York law, and Colorado law.  *See cases cited supra*.  If, in an effort to avoid the terms of PYP/5/COM, OPENWATER tries to repudiate PYP/5/COM, that is necessarily fatal to all claims of coverage. *Id*.  Either PYP/5/COM is effective in its entirety, in which case all its terms are effective, or PYP/5/COM is a nullity, in which case there cannot possibly be coverage and the matter is concluded.  *Id*.  Either way, the policy if marine insurance issued by GLI to OPENWATER affords no coverage for the dismasting.

## Argument – Fortuity and Dismasting

OPENWATER has completely missed the point of the denial of coverage based on the lack of fortuity.  As discussed in the caselaw analyzed below, the issue with the fortuity requirement is not whether a loss is subjectively foreseen or intended by the insured.  Those facts only matter in cases where the policy of marine insurance contains an Inchmaree Clause, discussed below.  Rather, since the policy of marine insurance issued by GLI contains no Inchmaree Clause, the real issue in this case is whether the insured can show that the loss was caused by a chance, or fortuitous, event acting upon the vessel.  If all the insured can show is that some part of the vessel failed, but cannot show what chance event acted upon the vessel to cause the failure, then the insured has failed to show that the loss was caused by a fortuitous event.  Moreover,

OPENWATER has misunderstood the allocation of the burden of proof.  With respect to fortuity, it is not GLI's burden to show anything.  It is certainly not GLI's burden to show that the loss was subjectively foreseen by the insured.  Rather, the burden is on OPENWATER to prove those facts of the loss which show that the dismasting was caused by a chance event.  *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 307; 1988 A.M.C. 223 (C.A.2.1987), *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 429; 1982 A.M.C. 658 (C.A.5.1980), *Axis Reinsurance Co. v. Resmondo*, 2009 A.M.C. 2597, 2616 (M.D.Fla.2009).

Where a vessel component breaks with no apparent cause, the loss is not fortuitous and is not covered, even by an "all risks" policy of marine insurance.  The difference between a fortuitous loss and a non-fortuitous loss is perfectly illustrated by an early American case dealing with an "all risks" policy of marine insurance, *Mellon v. Federal Ins. Co.*, 14 F.2d 997; 1926 A.M.C. 1449 (S.D.N.Y.1926).  The *Mellon* case arose out of a vessel which suffered two damaged boilers.  *Id*, at 998.  The port boiler burst during the performance of a hydrostatic test required by law.  *Id*.  The starboard boiler developed cracks several months later for no apparent reason.  *Id*.  The court explained that a "risk" or "fortuity" is something which happens to the vessel from without.  *Id*, at 1002.  Moreover, the court noted that insurance protects against risks and that insurance is not a mere warranty of soundness.  *Id*.  Therefore, since the bursting of the port boiler was attributable to the hydrostatic test required by law, an external event which acted upon the boiler, the bursting of the port boiler was held to be fortuitous and was covered by the "all risks" policy of marine insurance.  *Id*.  On the other hand, the starboard boiler, which appeared to suffer cracks without any evidence of an external force acting upon it, was held not fortuitous and the denial of coverage was affirmed.  *Id*.

In response to many situations like this, where vessel's suffered physical damage which could not be shown to be caused by chance external events (a.k.a., fortuities), the international marine insurance industry developed a special type of coverage, call the Inchmaree Clause, named after the vessel, *Inchmaree*. *Cleveland & B. Transit Co. v. Insurance Co. of North America*, 115 F. 431 (S.D.N.Y.1902), *Insurance Co. v. Hamilton*, 12 App. Cas. 484 (House of Lords, 1887). The *Inchmaree* suffered mechanical damage when a valve failed without any known cause. *Id*. The House of Lords held that, in the absence of any evidence showing what caused the valve to fail, the insured had not carried the burden of proving that some chance external event, a fortuity, acted upon the vessel to cause the loss. *Id*. In response, the Inchmaree Clause was specifically developed to afford coverage for certain types of physical loss which occurred without any known cause. *Id*. The only requirement was that the insured had to prove that the loss was not known or intended, and that loss did not occur through any want of due diligence. *Id*. All the insured had to show was that he was blameless and was surprised by the occurrence of the loss. *Id*.

Here in the United States, there are numerous cases which illustrate the difference between a fortuitous loss and a loss covered by an Inchmaree Clause. For instance, the case of *Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Penn.* dealt with an "all risks" policy covering a vessel that unexpectedly sprung a leak. 247 F.2d 116, 117; 1957 A.M.C. 1946 (C.A.5.1957). There was no dispute between the vessel owner and the insurer that there was no explanation for what caused the leak. *Id*, at 118. *Id*. But, unlike the present case, the policy in *Tropical* also contained an Inchmaree Clause. *Id*, at 119. The Fifth Circuit affirmed the district court's holding that the insured had failed to show that some fortuity caused the unexplained leak. *Id*. But, the Fifth Circuit held that the unexplained leak did fall within the much broader coverage of the Inchmaree Clause. *Id*. The Fifth Circuit explained that "the Inchmaree clause is an

expansion of coverage of considerable magnitude." *Id*, at 122. In order to claim coverage for an unexplained loss under the Inchmaree Clause, the insured need only show that the loss was unanticipated and that the insured had no knowledge of whatever defect may have existed. *Id*, at 121. Therefore, notwithstanding the lack of evidence of any fortuitous cause for the leak, the insured in the *Tropical* case was able to claim coverage under the Inchmaree Clause. *Id*.

The Eighth Circuit reached the same conclusion in the case of *Gibbar v. Calvert Fire Ins. Co.*, 623 F.2d 41; 1980 A.M.C. 2731 (C.A.8.1980). The *Gibbar* case concerned a vessel that sustained extensive damage in a fire. *Id*, at 42-43. Post-loss investigation revealed that the fire was caused by a fuel injector which became stuck. *Id*., at 43. Since, no cause could ever be determined for the stuck fuel injector, neither the district court nor the Eighth Circuit Court of Appeals held that the loss was caused by a fortuitous event. *Id*. Instead, just like the Fifth Circuit in the *Tropical* case, the Eighth Circuit looked to the far broader coverage afforded by the Inchmaree Clause. *Id*. Since there was undisputed evidence that the insured had no actual knowledge of the stuck fuel injector, the Eighth Circuit held that the loss was covered by the Inchmaree Clause, notwithstanding the lack of any evidence showing that a chance event caused the fuel injector to stick. *Id*.

The broad coverage afforded by the Inchmaree Clause demonstrates the precise issue in the present case: absent an Inchmaree Clause, there can be no coverage under an "all risks" policy where the insured fails to show that some chance, external event caused the loss. *Mellon*, *supra*.

This principle is perfectly illustrated by the recent *Fortelni* case involving the exact same marine insurer, GLI. *Great Lakes Reinsurance (UK) PLC v. Fortelni*, 33 F.Supp.3d 204 (E.D.N.Y.2014). The *Fortelni* case began with a vessel which unexpectedly began taking on water while being navigated in South Florida. *Id*, at 206. The investigation following the loss established

that water entered the vessel through a hose that became disconnected due to a failed clamp.  *Id*.

Just as in *Tropical* and *Gibbar*, neither party was able to present any evidence showing why the

clamp failed.  *Id*.  Just like the present case, the identical policy of marine insurance in *Fortelni*

afforded "all risks" coverage.  *Id*, 208-209.  Based on these facts, the Eastern District of New York

held that the insured could not recover because he had failed to show that some chance external

event caused the clamp to fail.  *Id*, at 209.  The court further noted, "To hold otherwise would

transform this 'all-risks' policy into a maintenance contract."  *Id*.[6]

Although there is no binding fortuity decision from the Tenth Circuit Court of Appeals,

there is a decision from the district court in Oklahoma which illustrates the fortuity requirement.

*Blythe v. Essentia Ins. Co.*, 2013 WL 6835279 (N.D.Ok.2013).  *Blythe* began, like so many cases,

with a wooden vessel that sank at its dock.  *Id*.  Just like the present case, the policy of marine

insurance afforded coverage against "all risks" of physical loss or damage.  *Id*.  Although disputes

of fact prevented the court from awarding summary judgment, the court held that one of the

contributing causes of loss, an interruption of shoreside power to the vessel's bilge pumps, would

certainly be considered a fortuitous event.  *Id*, at 3.  Unlike the *Fortelni* case, the insured in *Blythe*

was able to show more than a mere broken part.  Rather, the insured in *Blythe* was able to show

that an external event, the power outage, contributed to the loss.

Applying this caselaw to the present case, OPENWATER's summary judgment motion

completely misses the point of the fortuity dispute.  OPENWATER's entire argument that the

---

[6] It should be noted that there is a circuit split on the fortuity issue.  The Eleventh Circuit Court of Appeals has recently held that merely showing the broken mechanism suffices to prove fortuity and claim coverage under an "all risks" policy of marine insurance.  *Great Lakes Reinsurance (UK) PLC v. Kan-Do, Inc.*, 639 Fed.Appx. 599; 2016 A.M.C. 716 (C.A.11.2016), *LaMadrid v. National Union Fire Ins. Co. of Pittsburgh, PA*, 567 Fed.Appx. 695 (C.A.11.2014).  The undersigned was counsel for the marine insurer in both matters.  *Id*.  The undersigned has published an article on the subject and maintains that the Eleventh Circuit's decisions are in error.

dismasting was fortuitous depends upon counsel's repeated insistence that the dismasting was neither foreseen nor intended by the insured.  However, the problem for OPENWATER is that this is not the test for showing that a fortuitous event caused the dismasting.  Rather, showing fortuity requires identifying some outside force or influence that caused the dismasting.  Perhaps, if OPENWATER's policy had included an Inchmaree Clause, then it would suffice to merely show that OPENWATER had no knowledge of any fault in the mast and that OPENWATER did not intend for the mast to fall.  This is precisely how the insureds prevailed in *Tropical* and *Gibbar*. *Supra*.  If OPENWATER had wanted this sort of coverage, it could have purchased a policy from a different insurer.  However, since OPENWATER's policy of marine insurance does not contain an Inchmaree Clause, merely showing lack of knowledge and intent will not suffice.  As the court required in the *Fortelni* case, OPENWATER must identify the chance event that caused the mast to fail.  OPENWATER must identify some external cause which acted upon the vessel, such as the interruption of shoreside power in the *Blythe* case.  Without such evidence, all that can be shown is that the vessel broke.  To allow coverage for nothing besides a broken mast, without showing what external force acted upon the mast, would convert GLI's policy of marine insurance into a mere maintenance contract.  The "all risks" policy would be converted in a simple warranty of soundness.  Therefore, absent any evidence that the dismasting was caused by a chance event, there can be no coverage for OPENWATER's loss.

### Argument – Material Misrepresentation

Under both federal admiralty law and New York law, the misrepresentation of any material fact by the applicant voids the policy of marine insurance from its inception.  *Fireman's Fund Ins. Co. v. Great American Ins. Co. of New York*, 822 F.3d 620 2016 A.M.C. 1217 (C.A.2.2016), *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68; 1996 A.M.C. 2266 (C.A.2.1996).  This principle, called

"utmost good faith" or *uberrimae fidei*, is an entrenched principle of substantive federal admiralty law. *Id*. While the Tenth Circuit Court of Appeals has not yet rule on this issue, the Western District of Oklahoma has held that *uberrimae fide* is an entrenched principle of federal admiralty law. *Great Lakes Reinsurance (UK) PLC v. Sea Cat I, LLC*, 653 F.Supp.2d 1193, 1200; 2010 A.M.C. 703 (W.D.Ok.2009). Under federal admiralty law, the applicant for marine insurance, as the only party with the knowledge of the true facts pertaining to the risk, bears the sole burden of truthfully disclosing all material facts to the underwriter considering the application. *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 874; 1986 A.M.C. 1240 (C.A.2.1985). There is no burden whatsoever placed on the marine insurer to investigate the truth of the disclosed facts and the marine insurer is entitled to rely entirely on the duty of the applicant to disclose the truth. *Id*.

"A misrepresentation is material if it might have a bearing on the risk to be assumed by the insurer." *HIH Marine Services*, *supra*. To show materiality, the marine insurer must show that the disclosure of the true facts would have resulted in (1) a change in premium, (2) different policy terms, or (3) the refusal to issue any policy whatsoever. *Gulfstream Cargo Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 981-82; 1969 A.M.C. 781 (C.A.5. 1969), G. Gilmore and C. Black, *The Law of Admiralty*, §2-6 at 62 (2d ed. 1975). The rule requires disclosure of material facts, "even if not asked". *Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219, 222; 1995 A.M.C. 1201 (C.A.9. 1995).

For instance, the case of *Fireman's Fund v. Great American*, cited *supra*, concerned a policy of marine insurance issued by Great American affording coverage for a floating dry dock against a host of maritime risks. *Id*., at 626-27. Between 2004 and 2009, the insured submitted annual applications for policies of marine insurance. *Id*., at 629. For each of those years, Great American issued a policy of marine insurance based on the material facts disclosed on the annual

21

applications.  *Id.*  On every single application, the insured failed to disclose numerous engineering reports documenting the badly deteriorated condition of the dry dock.  *Id.*, at 630.  Following the sinking of the dry dock, Great American investigated the loss, discovered the poor condition of the dry dock, and uncovered the numerous reports showing that the insured knew of the deteriorated condition at the time that it applied for all the policies between 2004 and 2009.  *Id.* Therefore, Great American denied coverage for the claim.  *Id.*  Later, one of the other insurers paid the claim and, as the subrogee of the insured's rights under the policy, sued Great American for coverage.  *Id.*  On summary judgment, the district court applied the same principle which will decide the present case, that the applicant's material misrepresentations voided coverage from the inception.  *Id.*, at 631.

On appeal, the Second Circuit applied the same principles and reached the same conclusion.  *Id.*, 632-33.  First, the court held that with the invocation of admiralty jurisdiction under 28 U.S.C. §1333 comes the application of federal admiralty law.  *Id.*[7]  Second, the court held that it is a well-established rule of federal admiralty law that the parties to a contract of marine insurance "must accord each other the highest degree of good faith."  *Id.*, at 633.  Third, the court held that the duty imposed by *uberrimae fidei* requires the applicant for marine insurance to reveal all material facts, even if not specifically asked.  *Id.*  Applying the foregoing principles to the facts, the Second Circuit held that Great American established the materiality of the insured's

---

[7] GLI's first pleadings, its answer and counterclaim against OPENWATER, invoked this Court's admiralty jurisdiction.  DE#9, p. 7.  Where a court has admiralty jurisdiction, federal admiralty law applies, notwithstanding the invocation of diversity jurisdiction by the plaintiff.  *Ghotra by Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054; 1997 A.M.C. 1936 (C.A.9.1997), *AGCS Marine Insurance Company v. World Fuel Services, Inc.*, 220 F.Supp.3d 431, 440; 2016 A.M.C. 2984 (S.D.N.Y.2016), *Martin v. Great Lakes Reinsurance (U.K.), P.L.C.*, 2010 A.M.C. 590 (D.Ariz.2010), *Gibbs ex rel. Gibbs v. Carnival Cruise Lines*, 314 F.3d 125; 2003 A.M.C. 179 (C.A.3.2002).

misrepresentations by presenting the testimony of the underwriter who evaluated the applications. *Id.*, at 639. She testified that, had the surveys showing deterioration been truthfully disclosed, "[she] definitely would have been concerned" and "more than likely, I would have told them I didn't want to cover that vessel until they completed all the recommendations." *Id*. Based on this undisputed testimony, the Second Circuit affirmed the district court's grant of summary judgment and held that the failure to disclose these material facts voided the policy of marine insurance from its inception. *Id*.

In the present matter, the undisputed facts show that the only party with any knowledge regarding the work performed, or not performed, on the vessel was OPENWATER. Ex 9, pp. 93-104. OPENWATER was the only party that knew that the vessel was still missing vital safety gear, that there was still corrosion on the thru-hull and valve assemblies, that batteries still needed to be replaced, that impact damage had still not been repaired, etc. *Id*. As the only party with knowledge of these facts, it was OPENWATER's duty under federal admiralty law to truthfully disclose these facts to GLI.

Instead of disclosing the truth, the LOC executed by OPENWATER falsely represented that all of the recommendations in the Sands Report "have been" complied with. It is vital to note the tense of the phrase, "have been" in the LOC. The phrase, "have been" indicates the ***past tense***. *U.S. v. Cantaloupi*, 25 Fed.Appx. 519, 520 (C.A.9.2011), *Viet & Co., Inc. v. U.S.*, 56 Fed.Cl. 30, 32 (2003) (footnote 4), *Brook House Condominium Trust v. Automatic Sprinkler Appeals Board*, 607 N.E.2d 744, 746 (Mass.1993), *Blough v. Ekstrom*, 144 N.E.2d 436, 445 (Ill.App.1952). For instance, in the *Cantaloupi* case, a criminal defendant contested the temporal meaning of "have been" in a search certificate admitted by the government into evidence. *Id*. The Ninth Circuit Court of Appeals held that the certificate "declared in the past tense that no firearms 'have been'

acquired." *Id.* To give another example, in the case of *Veit & Co, Inc. v. U.S.*, a case concerning compliance with the Strategic Arms Limitation Treaty, the United States Court of Federal Claims referred to missile launch facilities and launch control facilities in the past tense when it said that these facilities "have been dismantled." *Veit, supra.* The execution of the LOC unambiguously asserted that all the recommendations in the Sands Report, except for the four listed, were complied with in the past.

Usher's undisputed affidavit makes clear that OPENWATER's false representations in the LOC were material to his judgment as a reasonable and prudent underwriter. Ex 2. The completion of these recommendations was material to his judgment as a reasonable and prudent underwriter because they all concerned the value of the vessel and the insured's care for the vessel. Ex 2, ¶¶19-22. Just like the underwriter in the *Great American* case, had he known that so many of the "**AA**", "**B**", and "**C**" recommendations had not been complied with, he would have refused to issue any policy whatsoever. Ex 2, ¶¶33-37. Moreover, Usher's affidavit explains that no prudent and reasonable underwriter would agree to insure a vessel if the application discloses a failure to comply with all survey recommendations. Ex 2, ¶37.

Numerous cases from federal courts throughout this country have held that where the truthful disclosure of facts such as these would have made a difference to the underwriter, the facts are material and the misrepresentation voids the policy of marine insurance from its inception. For instance, the case of *Great Lakes Reinsurance (UK) PLC v. Morales* arose out of a policy of marine insurance on a 2006 33-foot Avanti. 760 F.Supp.2d 1315 (S.D. Fla. 2010). Morales disclosed on the application that he and his co-operator each has more than twelve (12) years of experience operating vessels. *Morales*, at 1320. After the vessel was stolen, GLR's agent investigated the loss and discovered that neither disclosed operator had any experience operating vessels. *Morales*,

24

at 1320.  GLR denied the claim based on the insured's misrepresentation of material facts, sought

a declaratory judgment, and, on summary judgment, GLR submitted the affidavit of the exact same

underwriter as in the present matter, Beric Anthony Usher.  *Morales*, at 1319.  Just as in the present

matter, Usher explained that GLR's agent received the application and evaluated the risk based on

the material facts disclosed in the application.  *Id*.  Just as in the present matter, Usher explained

that the application specifically required truthful disclosure of the experience of the disclosed

operators because the risks associated with inexperienced operators are simply incalculable

because there is no history to evaluate.  *Id*.  Just as in the present matter, Usher swore that, had the

truth been disclosed on the application, he would never have agreed to issue any policy whatsoever.

*Id*.  Just as in the present matter, Usher explained that, had the truth about the operators'

inexperience been disclosed, no reasonable and prudent marine underwriter would have agreed to

issue any policy whatsoever.  *Id*.  Therefore, based on Usher's affidavit, the federal court granted

GLR's motion for summary judgment, holding that the operators' experience was material to

Usher's underwriting judgment and that the misrepresentation of the operators' experience voided

the marine insurance policy from its inception.  *Morales*, at 1325-26.  *Accord*, *Great Lakes*

*Reinsurance (UK) PLC v. Kranig*, 2013 WL 2631861 (D.V.I.2013), *Joseph v. Great Lakes*

*Reinsurance (UK) PLC* arose out of a policy of marine insurance on a 1998 36 ft. Baja Outlaw.

2011 WL 1230841 (N.D.Oh.2011), *Great Lakes Reinsurance PLC v. Arbos*, 2009 WL 8642003 at

*1. (S.D.Fla.2009).

      Just as in all the cases cited above, GLI is entitled to summary judgment in the present

matter because it is beyond dispute that OPENWATER misrepresented material facts when it

submitted the application.  As detailed above, OPENWATER misrepresented that thirty-three (33)

different recommendations in the Sands Report had been complied with when, in fact, none had yet been complied with.

Moreover, it makes no difference that the Sands Report claimed that various deficiencies could be addressed in the future because GLI did not draft the Sands Report and cannot be held responsible for OPENWATER's alleged misunderstanding of the certification contained in the LOC. If the Sands Report is ambiguous, that ambiguity cannot be turned to the advantage of OPENWATER because GLI did not draft the Sands Report. *Royal Ins. Co. v. Orient Overseas Container Line Ltd.*, 514 F.3d 621; 2008 A.M.C. 337 (C.A.6.2008) (applying federal admiralty law), *Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d 34; 1994 A.M.C. 1683 (C.A.2.1994) (applying New York law), *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 623 (Colo.1999) (applying Colorado law). The only document drafted by the marine insurer is the LOC, which unambiguously required OPENWATER to certify, upon pain of the policy being rendered void, that all the recommendations in the Sands Report "have been complied with". Ex 1, p. 3 (UF000021).

Opposing counsel's only other argument on this point seems to be that nobody warned his client that OPENWATER was giving false information to the marine insurer. This is the sort of illogic that one expects from the Queen of Hearts. *Alice's Adventures in Wonderland*, Lewis Carroll (1865). It's true that nobody warned OPENWATER that the information it provided was false, precisely because OPENWATER was the only party that knew that the facts asserted in the LOC were false. This exact same defense was raised by the insured in the *Cigna* case and was laughed at by the Ninth Circuit. *Cigna*, *supra*. The Ninth Circuit wrote, "Instead of contesting the fact that they did not disclose the foregoing information to Cigna, Polaris and Inbanco argued to the district court and now to this court that Cigna itself was at fault because it 'issued coverage

26

without warning of any deficiencies' in the application!  Polaris and Inbanco cite no authority to support this novel contention, which is contrary to the obligation of the applicant for marine insurance to disclose material information whether or not the insurer asks for it." *Id*, at 420.  The only party that knows the misrepresented facts are false is the applicant.  That is why federal admiralty law places the burden solely on the applicant to truthfully disclose all material facts.

As detailed above in the Usher affidavit, GLI's underwriting agent relied on the facts disclosed by OPENWATER in the application for the policy of marine insurance.  Usher's undisputed affidavit, attesting that he relied on those misrepresentations and based his underwriting judgment on those misrepresentations, necessarily means that those misrepresentations were material.  Upon such facts, the application of federal admiralty law is clear, and the policy of marine insurance issued by GLI to OPENWATER, consisting of the two-page Temporary Binder and PYP/5/COM, is void from its inception.

### Argument – Breach of the Letter of Compliance Warranty

Unlike the material misrepresentation issue, GLI has no burden whatsoever to show materiality with respect to OPENWATER's breach of the policy's survey compliance warranty, warranty q). Ex 7, p. 12.  Rather, all GLI has to show to prevail on this issue is that OPENWATER did not strictly, literally comply with warranty that the all the recommendations in the Sands Report had been completed.  This warranty arises, not from any misrepresentation of fact at the time of the application, but from the express terms of warranty q) on page 12 of PYP/5/COM.  Ex 7, p. 12.  Warranty q) stated: "If the survey makes any recommendations with respect to the Scheduled Vessel, then it is ***WARRANTED*** that all such recommendations are completed prior to any loss giving rise to any claim hereunder."  Ex 7, p. 12 [emphasis added].

Under New York law, warranties in polices of marine insurance must be strictly, literally complied with. *Stony Brook Marine Transp. Corp. v. Wilton*, 1997 WL 538913 (E.D.N.Y.1997), *Colvin v. Cigna Property and Cas. Co.*, 1992 WL 188347 (S.D.N.Y.1992).   Interpreting an identical policy of marine insurance (issued by the same marine insurer and containing the exact same choice of law clause), District Judge Adalberto Jordan, who now sits on the Eleventh Circuit Court of Appeals, wrote, "New York law has long provided that the breach of an express warranty [in a marine insurance policy], whether material to the risk or not, whether a loss happens through the breach or not, absolutely determines the policy and the assured forfeits his rights under it." *Great Lakes Reinsurance (UK), PLC v. Rosin*, 757 F.Supp.2d 1244, 1257-58; 2011 A.M.C. 223 [internal quotations and citations omitted].

In the present case, the facts established in Gordon's deposition are undisputed that numerous recommendations in the Sands Report had not been completed. Ex 9, pp. 93-104.  Of course, the Sands Report itself states the opinion of the survey that not all the recommendations were terribly urgent.  Ex 1.  However, that surveyor's opinion makes no difference whatsoever to the entirely separate warranty made by OPENWATER.  Regardless of what that surveyor may have expressed to OPENWATER in the Sands Report, OPENWATER warranted to GLI that "all such recommendations are completed".  Ex 7, p. 12.

In order to resolve the issue, the only question to be answered is this: is it strictly, literally true that all the recommendations in the Sands Report were completed?  Based on Gordon's undisputed testimony, the only possible answer is, "no".  Ex 9, pp. 93-104.  The evidence is undisputed that all the following recommendations were not completed: AA1, AA3, B1, B3, B4, B6, B7, B8, B9, B15, B18, B21, B23, B24, B26, C2, C3, C4, C6, C8, C9, C10, C11, C14, C15, C18, C19, C21, C22, C25, C26, C27, C28.  *Id.*  Because this is a warranty issue, there is no burden

whatsoever on GLI to show that the breach of the warranty was material to the risk or that the breach played any role in the loss. *Rosin*, at 1257-58. Under New York law, OPENWATER's failure to strictly comply with the survey "forfeits [OPENWATER's] rights under the policy" and there can be no coverage for the present loss. *Id*.

## Conclusion

As detailed above, OPENWATER really has no idea what the legal issues are and what facts are material to the parties' claims. OPENWATER is ignorant of the duty to voluntarily disclose material facts, OPENWATER is ignorant of the rule that coverage cannot arise by estoppel, and OPENWATER is ignorant of the burden the insured must carry to prove that a loss was caused by a fortuitous event.

WHEREFORE, Defendant GLI urges this Court to deny the Plaintiff's pending motion for summary judgment, and award all such further relief as may be appropriate in the premises.

Respectfully submitted, this 19th day of August, 2019.

ATTORNEYS FOR GREAT LAKES
INSURANCE SE

McCONAUGHY & SARKISSIAN, P.C.          GOLDMAN & HELLMAN
By: /s/ Kate L. McDonald                         By: /s/ Michael I. Goldman
Ivan A. Sarkissian, CO Bar No. 28817         Michael I. Goldman, MA Bar No. 677362
Kate L. McDonald, CO No. 42284              Goldman & Hellman
8310 South Valley Highway, Suite 250         233 Harvard Street, Suite 211
Englewood, Colorado 80112                    Brookline, MA 02446
Tel: (303) 649-0999                          Tel: (617) 566-4200
Fax: (303) 649-0990                          Fax: (617) 566-4292
Email: sarkissian@mslawpc.com                Cel: (617) 320-9854
Email: elavance@mslawpc.com                  Email: michael@goldmanandhellman.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2019, I electronically filed the foregoing GREAT LAKES INSURANCE SE'S OPPOSITION TO OPENWATER SAFETY IV, LLC'S MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Richard A. Oertli, #24926 | Kevin P. Perez, Esq. |
| 24800 Squaw Pass | 445 Union Blvd, Suite 209 |
| Evergreen, CO 80439 | Lakewood, Colorado 80228 |
| T: 720-799-5217 | T: (720) 638-1234 |
| E: dickoertli@gmail.com | E: kperez@nemirowperez.com |
| | |
| Counsel for Openwater Safety IV, LLC | Counsel for Mark Gargula, |
| | Gowrie Group, Inc., |
| | and Maritime Program Group, Inc. |

/s/ Michael I. Goldman, Esq._____